| | |
|---|---|
| LINDA FOWLER and ISABELLA BENMELEH, on behalf of themselves and all others similarly situated,<br><br>                  Plaintiffs,<br><br>    v.<br><br>ASR GROUP INTERNATIONAL, INC.; AMERICAN SUGAR REFINING, INC.; DOMINO FOODS, INC.; UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE f/k/a UNITED SUGARS CORPORATION; MICHIGAN SUGAR COMPANY; COMMODITY INFORMATION, INC.; and RICHARD WISTISEN,<br><br>                  Defendants. | Case No. _____<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs LINDA FOWLER and ISABELLA BENMELEH ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against the above-captioned Defendants, ASR GROUP INTERNATIONAL, INC. ("ASR Group"), AMERICAN SUGAR REFINING, INC. ("ASR"), DOMINO FOODS, INC. ("Domino," together with ASR Group and ASR as "ASR/Domino"), UNITED SUGAR PRODUCERS & REFINERS COOPERATIVE f/k/a UNITED SUGARS CORPORATION ("United"), MICHIGAN SUGAR COMPANY ("Michigan Sugar", and collectively with ASR/Domino and United, the "Producing Defendants"), COMMODITY INFORMATION, INC. ("Commodity"), and RICHARD WISTISEN ("Wistisen") (collectively, "Defendants") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel, as follows:

## I.     NATURE OF THE ACTION

1.      Today, more than ever, Americans are feeling the pressure of higher prices at the supermarket.  As basic products become ever more expensive, consumers have been forced to choose between going without necessities or paying exorbitant prices.

2.      One such product is sugar.

3.      However, higher sugar prices are not due entirely to natural market conditions. Rather, higher sugar prices are due in-part to the collusive conduct of the sugar industry to illegally fix the price for white, refined, table sugar ("Granulated Sugar") throughout the entirety of the United States ("Relevant Market").

4.      Using a digital conduit produced by Defendants Commodity and Wistisen, the Producing Defendants are able to fix the price of Granulated Sugar in the Relevant Market through

the exchange of detailed, competitively sensitive, non-public information regarding Granulated Sugar prices, capacity, sales, volume, supply and demand.

5.     As a result of Defendants' unlawful conduct – which conduct violates the Sherman Antitrust Act, as well as state antitrust laws – indirect purchasers of Granulated Sugar in the United States and its territories, including Plaintiffs and the Class members, paid supracompetitive prices for Granulated Sugar sold by the Producing Defendants in the United States and its territories beginning no later than January 1, 2019, and running through the time that the unlawful conduct alleged herein ceases (the "Class Period") .

## II.     JURISDICTION AND VENUE

6.     **Subject Matter Jurisdiction.**  This Action arises, in part, under the Sherman Antitrust Act as well as the Clayton Act.  *See*, 15 U.S.C. § 1, 15 U.S.C. §§ 15 and 18.  Additionally, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), through the Clayton Act 15 U.S.C. §§ 15 and 26, and through the Class Action Fairness Act of 2005 ("CAFA"). *See*, 28 U.S.C. § 1332(d).  This Court has subject matter jurisdiction under CAFA because the amount in controversy exceeds the sum of $5,000,000 (exclusive of costs and interest), there are more than 100 putative members of the Class, and minimal diversity exists between the litigants, as one or more Class members is a citizen of a state different than the home of at least one of the Defendants.  In particular, Michigan Sugar is a Michigan corporation headquartered in Michigan, whereas Plaintiff Fowler resides in New York.

7.     **Supplemental Jurisdiction.**  In addition to violations of the federal antitrust laws, Plaintiffs allege violations of state antitrust and state consumer protection law.  All claims under federal and state law are based upon a common nucleus of operative fact.  Therefore, the entire action should be commenced in a single case to be tried as one judicial proceeding.  This Court,

therefore, has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state-law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

8. **Personal Jurisdiction.** This Court has personal jurisdiction over each of the Defendants because each Defendant transacts business or may otherwise be found in this District. Additionally, each Defendant has substantial contacts throughout the United States, including in this District, and/or are engaged in an illegal, anticompetitive scheme that was directed at, and had the intended effect of, causing injury to persons located or doing business throughout the United States, including in this District. Furthermore, Domino Foods maintains significant contacts in this District, including offices as well as one of Domino's major sugar refineries.

9. **Venue.** Venue in this District is proper because each Defendant transacts business or has registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to consumers in this District.

10. **Interstate Commerce.** Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming consumers throughout the United States.

## III. PARTIES

### *Plaintiff Linda Fowler*

11. Plaintiff Fowler is a resident of New York. Plaintiff has made numerous purchases of Domino's Granulated Sugar during the Class Period. As a result of Defendants' anticompetitive practices, Plaintiff paid and continues to pay higher prices for Granulated Sugar. But for Defendants' anticompetitive conduct, Plaintiff would have paid lower or non-supracompetitive prices in the Relevant Market.

### Plaintiff Isabella Benmeleh

12.     Plaintiff Benmeleh is a resident of Florida.  Plaintiff has made numerous purchases of Domino's Granulated Sugar during the Class Period.  As a result of Defendants' anticompetitive practices, Plaintiff paid and continues to pay higher prices for Granulated Sugar.  But for Defendants' anticompetitive conduct, Plaintiff would have paid lower or non-supracompetitive prices in the Relevant Market.

### Defendant ASR Group International, Inc.

13.     Defendant ASR Group International, Inc. is a privately held Florida corporation and global producer of Granulated Sugar based in West Palm Beach, Florida.  ASR Group claims to be "the world's largest refiner and marketer of cane sugar."

### Defendant American Sugar Refining, Inc.

14.     Defendant American Sugar Refining, Inc. is a privately held Florida corporation and global producer and seller of Granulated Sugar based in West Palm Beach, Florida.  ASR is an affiliate and/or subsidiary of ASR Group.

### Defendant Domino Foods, Inc.

15.     Defendant Domino Foods, Inc. is a subsidiary belonging to ASR Group and ASR and serves as the marketing and sales subsidiary for ASR's production of Granulated Sugar.  Domino maintains a principal place of business in West Palm Beach, Florida.  Several of its offices and one of its three refineries are located in this District.  ASR/Domino markets most of its Granulated Sugar under the "Domino" brand name.

### Defendant United Sugar Producers & Refiners Cooperative
###    f/k/a United Sugars Corporation

16.     Defendant United Sugar Producers & Refiners Cooperative f/k/a United Sugars Corporation, a Minnesota corporation, is a marketing cooperative based in Edina, Minnesota.

United has four member owners: (1) United States Sugar Corporation, (2) American Crystal Sugar Company; (3) Minn-Dak Farmers Cooperative; and (4) Wyoming Sugar Company, LLC, all of which grow and process sugar at eight production facilities located in Montana, North Dakota, and Wyoming.

17.     United approaches the market as a unified competitor, marketing and selling all of the Granulated Sugar produced by its member owners.  United handles locating customers, negotiating sales contracts, and arranging all logistics.  United also sets the prices for all of the products it markets and sells on its members' behalf.

### *Defendant Michigan Sugar*

18.     Defendant Michigan Sugar Corporation, a Michigan corporation, is a cooperative consisting of 900 sugar beet grower-owners.  It is headquartered in Bay City, Michigan and has sugar beet processing facilities in Bay City, Caro, Croswell, and Sebewaing, Michigan.  Michigan Sugar also has warehouse facilities in Michigan and Ohio.

### *Defendant Commodity Information, Inc.*

19.     Defendant Commodity Information, Inc. is a Delaware corporate based in Orem, Utah.  Throughout the Class Period, the Producing Defendants all utilized Commodity to implement the conspiracy and the exchange of confidential, proprietary and competitively sensitive non-public information.

### *Defendant Richard Wistisen*

20.     Defendant Wistisen is the principal of Commodity, who, as part of Defendants' unlawful agreement, collected and shared confidential, proprietary and competitively sensitive non-public information between the Producing Defendants.

## IV.     FACTUAL ALLEGATIONS

### *The Relevant Market and Market Power*

21.     The Relevant Market is the market for Granulated Sugar in the United States.  Over 80% of all sugar consumed is Granulated Sugar.  In 2023, the market for Granulated Sugar in the United States totaled $13.2 billion.

22.     During the Class Period, the Producing Defendants, either directly or through their subsidiaries or affiliates, sold Granulated Sugar in the United States in a continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.  Additionally, during the Class Period, the Producing Defendants controlled a majority of the Relevant Market.

23.     Sugar is a ubiquitous ingredient found in almost every American's kitchen.  It is refined from sugar beets or sugar cane and sold to wholesale customers in various forms (granulated, liquid, and powdered) and varieties (white and brown).  From there, it then makes its way onto grocery shelves and into the foods that Americans eat every day.

24.     "Granulated Sugar," also known as "refined," "white," or "table" sugar, is sugar ground to a certain size.  The refining process used to create white sugar removes molasses.  As its name implies, Granulated Sugar does not include sugar in any liquified form.  Granulated Sugar can be manufactured from either cane sugar or beet sugar.  Granulated Sugar is a common ingredient found in many foods.  Dry, granulated, white sugar is manufactured and sold to direct purchasers who resell, consume, or further refine it into various other types of sugar products. Granulated Sugar is the predominant form of sugar sold in the United States.  Only three companies in the United States produce Granulated Sugar from cane sugar: United, ASR/Domino, and Louisiana Sugar Refining ("LSR"). A fourth company, Imperial, also produced Granulated Sugar from cane prior to being acquired by United States Sugar.

25.     Granulated Sugar, regardless of whether it is made from sugar cane or sugar beets, is a commodity product with little or no differentiation based on the producer.

26.     The Relevant Market is highly concentrated.  For example, in the Southeast United States, United and ASR/Domino have a nearly 75% market share for sugar sales in what the Department of Justice in 2023 described as "leaving … customers in this region at the mercy of a cozy duopoly."  Because of the concentration of this market, consumers are left without choice, and the few competitors that do exist are easily able to collude, as alleged herein.

27.     Granulated Sugar producers, either directly or via their marketing affiliates, market and sell directly to customers, including food and beverage manufacturers, retailers, food service companies, and distributors.  Additionally, Granulated Sugar producers sell indirectly to consumers and businesses through retailers, food service companies and distributors.  Ultimately, downstream, indirect purchasers bear the final price for any supracompetitive prices that distort the Relevant Market.

### *Defendants Fix Prices in the Relevant Market*

28.     The Producing Defendants agreed to artificially raise, fix, maintain, or stabilize prices of Granulated Sugar throughout the Class Period.  To implement their unlawful agreement, upon information and belief, they knowingly shared accurate, competitively sensitive, non-public information with each other, including through Commodity.[1]  There is no economically rational reason for the Producing Defendants to share such information other than to implement their unlawful agreement.  This information was shared for the purpose of enabling Defendants to effectuate their agreement to artificially raise prices and avoid competing with one another.

---

[1]       This conduct is further detailed in the highly-specific factual allegations made in *KPH Healthcare Services, Inc. v. ASR Group International, Inc.*, Case No. 1:24-cv-01941 (S.D.N.Y. March 14, 2024).

29.     The Producing Defendants used Commodity to facilitate the price-fixing conspiracy.  Commodity purports to analyze the sugar industry.  However, Commodity has no public presence.  It does not maintain a website on the internet, does not advertise its services to the public, and does not publish publicly available reports on the sugar industry or offer to sell or provide any reports on, or analysis of, the sugar industry other than to a select few producers, as alleged herein.

30.     Commodity does not gather information through voluntary surveys or periodic polling that it anonymizes.  Rather, the Producing Defendants regularly shared competitively sensitive information about their pricing and sold positions with Commodity.  Commodity, in turn, contemporaneously shared that competitively sensitive information with the Producing Defendants.

31.     Commodity does not make its reports available to purchasers of Granulated Sugar and others in the sugar supply chain, including consumers, thereby strengthening the advantage that the Producing Defendants gain by sharing information only with one another as producers.

32.     The Producing Defendants understand the competitive sensitivity of the information they provide to Commodity.  Commodity understands that the competitively sensitive information that the Producing Defendants share would not ordinarily be disclosed to competitors. The purpose of their sharing was to enable United, Michigan Sugar, and ASR/Domino to raise, fix, maintain, stabilize, or coordinate prices of Granulated Sugar in the United States.

33.     The information exchanged through Commodity included the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, contract prices, crop yields, and crop size.

34.     A sold position is the percentage of a seller's supply of Granulated Sugar that has been sold.  As a seller's sold position increases, that seller will generally raise prices.  The sold position thus provides important information about the extent to which a supplier will or will not be aggressive on price going forward. Knowing each other's sold positions allowed the Producing Defendants to be more aggressive with pricing.

35.     Using the non-anonymized, competitively sensitive non-public information exchanged through Commodity, the Producing Defendants ensured that they would not undercut each other's prices and cause prices to decrease as they would in a competitive market.  The Producing Defendants learned of each other's current pricing, crop size, crop yields, future beliefs on pricing, and sold positions only because Commodity collects this competitively sensitive information from each of them and shares it with the other Producing Defendants, pursuant to their unlawful agreement.

36.     Commodity provided this reciprocal information to the Producing Defendants rapidly, often within hours of having received it.  The Producing Defendants then used the information they received from Commodity when deciding how much to charge for their products.

37.     The sharing of information between the Producing Defendants thus enabled them to artificially raise, fix, maintain, or stabilize the prices at which Granulated Sugar was sold to their customers pursuant to their anticompetitive agreement.

38.     Due to United States Department of Agriculture ("USDA") production allotments linked to USDA loan programs and limitations on imports and tariffs, the Producing Defendants know that as they sell out of Granulated Sugar, they can charge higher prices because there will be little to no additional competitive product available in the market that could force them to reduce

price. Thus, knowing one another's sold position allows them to calculate when and how much they can raise, fix, maintain, or stabilize prices due to the amount of supply.

39.     Furthermore, as market leaders, the Producing Defendants account for the majority of Granulated Sugar production and sales. As a result, smaller market participants are not an effective competitive constraint on Producing Defendant's dominance.

40.     The exchange of pricing, crop size and yield, and sold position information by the Producing Defendants was intended to ensure, and did ensure, higher prices for Granulated Sugar than would have existed in a competitive market unaffected by the Defendants' anticompetitive agreement.

41.     As detailed below, similar conduct by earlier producers of Granulated Sugar led to a consent decree in 1978 that forbade such information exchanges by competitors.

### *The Anticompetitive Agreement*

42.     The Producing Defendants knowingly and intentionally sought, shared, received, and used non-public, competitively sensitive information from Mr. Wistisen pursuant to their anticompetitive agreement as alleged below, in order to raise, fix, maintain, or stabilize Granulated Sugar prices.

43.     United's sold position was confidential, and its employees were supposed to keep that information close to the vest. Nevertheless, United shared it with Mr. Wistisen, who they knew would pass it along to ASR/Domino and other competitors.

44.     ASR/Domino has a written code of conduct with an ethics policy that prevents any ASR/Domino employee from directly talking about ASR/Domino's pricing with a representative of one of ASR/Domino's competitors. Nevertheless, ASR/Domino employees indirectly shared

non-public, confidential, commercially sensitive pricing, sold position, and other information with Mr. Wistisen knowing that he would provide the information to other competitors.

45.     United does not publish the company's current Granulated Sugar prices or its sold position, *i.e.,* the percentage of its crop that is booked for the current fiscal year.

46.     Despite these internal policies, the Producing Defendants shared competitively sensitive information with one another through Commodity during the Class Period pursuant to their agreement.  The information exchanged includes the companies' current pricing, future or forward pricing, pricing strategies, sold positions, spot prices, and contract prices.  The Producing Defendants used the information they received from Commodity when deciding how much to charge for their products pursuant to their price-fixing agreement.

47.     Commodity provided this reciprocal information to the Producing Defendants rapidly, often within hours of receiving it.  High-level executives at the Producing Defendants, who had direct involvement in pricing, shared the sensitive information with Mr. Wistisen.  The sharing of information between the Producing Defendants thus allowed them to raise, fix, maintain, or stabilize Granulated Sugar prices pursuant to the unlawful agreement.

48.     The unlawful agreement to fix prices was implemented through information exchanged through Commodity, which included current pricing, future or forward pricing, pricing strategies, and sold positions.  The pricing shared among United, Michigan Sugar, ASR/Domino, and Commodity included spot prices, contract prices, and sold positions.  Current spot prices can also be turned into contract prices.

49.     Additionally, Mr. Wistisen's conduct during the Class Period helped make price-fixing between the Producing Defendants possible.    Below is an example of Mr. Wistisen's conduct as obtained and then illustrated by the Department of Justice:



50. As an additional example, an email communication to Mr. Wistisen from ASR/Domino's Vice President of Industrial Sales, Alan Henderson, disclosed ASR/Domino's 2020 pricing and sold positions. ASR/Domino disclosed this confidential information knowing it would be shared with its competitors, and in return, that it would receive its competitors' confidential information. Mr. Wistisen responded that he would send crop and pricing updates in the next day or two.

51. The Producing Defendants provided accurate information to each other through Mr. Wistisen. ASR/Domino was typically "upfront" with the information it provided to Mr. Wistisen. In one example of such "upfront" information, Mr. Henderson disclosed to Mr. Wistisen in an August 2020 email pricing updates for ASR/Domino Granulated Sugar.

52.     Mr. Wistisen told both United and ASR/Domino that he spoke with Michigan Sugar and other sellers, and that the information he provided came directly from them. For example, Mr. Wistisen wrote to United that "Domino saying back up to $40.50 to $41," on one occasion, and on another, he wrote to Mr. Henderson that "the United [pricing and sold position] info I provided was direct from them this morning. They held a huddle yesterday (sounded like all sales reps/VP were present), and those numbers were the result." When discussing pricing, Mr. Wistisen stated that he did not have Michigan pricing yet, and "I hope to talk with them [Michigan] on Fri./Mon."

53.     Mr. Wistisen provided information on pricing and sold position to the Producing Defendants rapidly, often soon after having received it. On September 21, 2020, Mr. Wistisen separately asked, within minutes, Mr. Henderson and Eric Speece, a Director of Strategic Accounts at United, if there was "anything new of interest on the pricing front?" They each responded with their company's respective pricing and sold positions. Mr. Speece shared, "We are firm at $36.50 (no change) and now $38.50 on cane (an increase of $0.50/cwt) and yes you heard correctly we are 90+% sold." In response, Commodity thanked United "for keeping the communication lines open!"

54.     At the same time, Mr. Wistisen emailed Mr. Henderson, relaying, "United also 90+% (including cane) not sure on price, last indication was early Sep, were still in market and mostly firm at $36.50 and $38. Just getting started on cane side. Early read suggests $38-40, so down on the coasts and up in south." Mr. Henderson responded, "Lots of meeting[s] this week so I'll keep it short. Pricing (Cane)[:] North and mid-Atlantic - $40.50 to 41.00 FOB – prices were lower past few weeks but have firmed up to these levels. No discounting at this time. Gulf - $38.50 fob[.] West - $40.50 to $41.00 fob firm[.]" They also discussed other things such as sold positions of ASR/Domino's competitors.

55. On September 22, 2020, within a few hours of receiving Mr. Henderson's response, Mr. Wistisen provided United and ASR/Domino with the information from each other in emails less than a minute apart. Wistisen told ASR/Domino that "U.S. Sugar recently increased to $38.50, so looks like range is $38.50 to $41, nice increase over last month. . . . Beet not much change from earlier indications, prices are $36.50 to $38.75, very little sugar available at low price, industry coverage 87%, all but NSM over 90+% booked." To United, Mr. Wistisen wrote, "ASR saying back up to $40.50 to $41. So now I have cane range at $38.50 to $41 Coverage . . . . ASR 5% below that, and other southern refiners up 10-15% from the average. . . . Waiting to confirm from Michigan, but Midwest ranging from $36.50 to 38.75, very little available at low price (so I hear)."

56. Similarly, Mr. Wistisen shared Michigan Sugar's pricing and sold positions with United and ASR/Domino. In August 2020, he reported to Mr. Henderson at ASR/Domino, "My goodness, what a difference a month makes. Michigan 85+% booked." The next month, Mr. Wistisen reported, "Michigan holding forecasts unchanged, sugars nearing 16%, factories running well, stockpiling on Oct. 19th." He added with regard to pricing that Michigan was at "$38.5+, selective selling."

57. In yet another example, Mr. Wistisen emailed both Mr. Speece at United and Mr. Henderson at ASR/Domino within approximately 40 minutes of each other in mid-November 2020 asking "where [they] would put . . . prices?" Both responded later that day with pricing information.

58. The communications between Mr. Wistisen and United, Michigan Sugar, and ASR/Domino were specific regarding pricing. In a November 2020 email, ASR/Domino's Mr. Henderson emailed Mr. Wistisen, "Prices have firmed up again based on higher #16 values, beets close to sold out and less imports, tier 2 sugar available at this time. Near-by values back up to

$46.00 FOB all locations. For calendar 2021: East/West - $42.00 fob[;] Gulf - $39.50 fob[;] Cane Coverage – 85-90%[.]" Mr. Wistisen responded by providing United's pricing to ASR/Domino.

59.     That same month, Mr. Wistisen emailed Domino/ASR asking for "[a]ny guidance [ASR/Domino] could give on how sub-30 cent No 16 prices makes sense?" Mr. Henderson at ASR/Domino and Mr. Wistisen exchanged messages regarding the "reason" Mr. Henderson had "heard," and Mr. Wistisen responded with real-time information from competitor United, "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 based on demand, inventories, No. 16, and looking down the road and expecting another year of tight quotas in FY22. . . . Selling FY21 firm, good activity, little to no competition from NSM or Western." Mr. Henderson passed this along to others in ASR/Domino, adding, "United is usually pretty upfront with [Wistisen]."

60.     In another message in April of 2021, Mr. Wistisen wrote to ASR/Domino regarding pricing. Mr. Henderson responded with specific prices and told Mr. Wistisen, "I believe your price predictions below are very accurate. Prices in PY21 are very firm."

61.     In May of 2021, ASR/Domino informed Mr. Wistisen of FY21 pricing. Mr. Wistisen responded that United's "prices [were] unchanged."

62.     In June of 2021, Mr. Wistisen sent an email to ASR/Domino stating that he had "heard . . . United reportedly (I'll talk with them tomorrow) holding $36.50 gross . . . [a]nd that ASR is holding firm on the coasts." Mr. Henderson at ASR/Domino responded that "[w]ord on the street [was] United moving up a $1.00 cwt since bookings now over 60%." Mr. Henderson then went on to share future prices for the fourth quarter of 2021. In July, Mr. Wistisen responded, among other things, that "Michigan . . . 80+% [booked,] and rumors suggest United is also now around 80% booked and recently increased prices (I hope to have confirmation soon)."

ASR/Domino's Mr. Henderson forwarded Mr. Wistisen's message to coworkers saying, "no official word yet. Let's see if we can hunt something down."

63.     Also in July of 2021, Wistisen emailed Mr. Henderson saying, "the United info I provided was direct from them this morning. . . . They are a hair shy of 90% sold."

64.     In another example, United's Mr. Speece provided United's current pricing to Mr. Wistisen and informed him that he did not "anticipate any changes to our prices" as they had "zero problems selling at those values." Mr. Wistisen responded, "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices to change much from remainder FY21?" to which Mr. Speece responded, "Give me a ring and we can discuss." After confirming the information with Mr. Speece by phone, Mr. Wistisen wrote to ASR/Domino's Mr. Henderson a few hours later providing the information that he had a "[l]ong conversation with United" and that United "won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50."

65.     The Producing Defendants' personnel also received sensitive pricing and sold position information from Mr. Wistisen on other sellers. For example, Mr. Wistisen provided Mr. Henderson pricing information regarding Cargill in July 2021, to which Mr. Henderson responded, "Cargill also makes no sense . . . . Last I heard they were at $38.50 gross fob bulk Gramercy."

66.     The Producing Defendants used the sensitive information they exchanged through Mr. Wistisen in furtherance of their anticompetitive agreement and used it to send messages to competitors about desired price levels. For example, Robert Sproull, Senior Vice President of Sales & Marketing at ASR Group, forwarded pricing information from Mr. Wistisen to others at ASR/Domino with a recommendation of what price ASR/Domino would have to offer to win a specific customer's business. In another example, United's Mr. Speece thought a competitor was

selling at too low a price, so he told his colleagues that United "may want to communicate pricing earlier than the colloquium to send a message." Knowing a competitor's sold position was used to justify higher prices.

67. ASR/Domino's Mr. Henderson frequently forwarded the information obtained about other competitors from Mr. Wistisen to his sales team and his superior. In one such example, Mr. Henderson received, and forward to his subordinates, information from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar." In another example, Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory position that he received from Mr. Wistisen.

68. United not only received information from Mr. Wistisen that it used in pricing decisions and to send messages about pricing to competitors, but also affirmatively used him to signal to competitors. In one example, United's Executive Vice President, Dirk Swart, told United's Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38, but United was contemplating increasing its prices given its sold position. They discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone.

69. United's Mr. Swart believes that the "better information about what [his] competitor's actual prices were, [United] could better avoid these destructive situations" of customers using pricing information to negotiate better prices.

70. Mr. Wistisen also wrote to ASR/Domino's Mr. Henderson, asking him: "Wondering where you would put Granulated prices and coverage?" An hour and fifteen minutes later, Mr. Henderson provided "[p]ricing for FY20."

71.     On August 17, 2020, Mr. Wistisen wrote to Mr. Henderson, providing him with sugar market updates and asked: "Where would you put cane prices and coverage?" The next day, August 18, Mr. Henderson responded: "Quick update: Pricing: [next three lines redacted]."

72.     On September 21, 2020, Mr. Wistisen wrote to Mr. Henderson again, providing several paragraphs of sugar industry news, after which he asked: "Anything new of interest on the pricing front? . . . Where would you put ASR/Domino prices . . . ?" On September 22, 2020, Mr. Henderson responded with "Pricing (Cane)." Mr. Wistisen quickly answered back: "U.S. Sugar recently increased to $38.50, so looks like the range is $38.50 to $41, nice increase over last month."

73.     On November 16, 2020, Mr. Wistisen wrote to ASR/Domino, asking: "Curious what you're hearing on domestic raw and Granulated pricing. I haven't heard back from United yet. Did they pullback from spot market? Where would you put prices and cane coverage?" Mr. Wistisen received his response from ASR/Domino later that day.

74.     On January 19, 2021, Mr. Wistisen wrote to United delivering several paragraphs of information on developments in the sugar industry. Near the end, he asked: "Has United put out a price range on FY22?" On January 20, Mr. Speece at United responded: "We have not yet set pricing for 2022, but we will soon."

75.     On February 15, 2021, Mr. Wistisen wrote to Mr. Speece at United: "Any action in FY22? Has United put a number on it yet? No word back from other processors/Refiners, I'll send along indications." Mr. Speece quickly responded: "We are still at the $36.50 and $38.50 with zero problems selling at those values. I do not anticipate any changes to our prices, but we have not formally decided. No action on 2022 just some small inquiries." Mr. Wistisen asked: "Just to clarify: United has not issued FY22 list prices, and at this point doesn't expect FY22 prices

to change much from remainder FY21?" On February 16, 2021, Mr. Speece answered: "Give me a ring and we can discuss."

76.     The next day, February 17, 2021, Mr. Wistisen wrote to ASR/Domino: "Long conversation with United: won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50 . . . ."

77.     On April 29, 2021, Mr. Wistisen wrote to Mr. Henderson: "Where would you put price ranges and demand?  I have spot $36.50 firm Midwest, $39.00 firm Michigan (but watching Baltimore progress, could creep higher), and east and west coasts now at $44.00.  And forward I have quoting at $35.50-$36 Midwest, 37.50-38 Gulf, $42.00 Coasts," and provided pricing information. Mr. Henderson responded: "I believe your pricing numbers below are very accurate."

78.     On May 11, 2021, Mr. Wistisen wrote to ASR/Domino: "Are those higher spot prices, [redacted] holding up?"  On May 12, 2021, Mr. Henderson responded: "All is good in Baltimore. Melt rates close to 90% of pre-fire levels.  With that being said near-by prices are selling at [redacted]."

79.     On May 18, 2021, Mr. Wistisen wrote again to ASR/Domino: "Just talked with United: prices unchanged, spot and forward."

80.     On June 16, 2021, Mr. Wistisen wrote to ASR/Domino: "The word from United: 80-85% sold, will be at 90 very soon.  Beet holding at $36.50 firm, and cane increased to $39.50 firm. . . . Any changes in ASR/Domino forward prices? I have you at [redacted] and [redacted]." Later, Mr. Wistisen adds: "The United info I provided was direct from them this morning."

81.     On July 12, 2021, Mr. Wistisen wrote to ASR/Domino, asking, "What's happening on the cane side of the fence?  Sounds like you're now [redacted], and Imperial $49.  Where would

you put forward pricing and coverage?"  Mr. Henderson responded: "United price increase. Rich is thinking $2.00 increase but no official word yet."

82.    There is no plausible, non-conspiratorial justification for the Producing Defendants to use Commodity to secretly share highly confidential and proprietary detailed information about their pricing and sold position.  In a competitive market, such proprietary, competitively sensitive information would be a closely guarded secret.  Economic theory demonstrates that the routine exchange among competitors of such sensitive internal company information reduces the intensity of competition.

83.    Defendants knew and intended that their private exchanges of competitively sensitive information about prices and sold positions would allow them to artificially raise, fix, maintain, or stabilize Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

84.    The Producing Defendants are interested in achieving higher prices for Granulated Sugar.  In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower."  United's CEO Matthew Wineinger testified that he was "confident" that "word got back" to United's competitors.

85.    Similarly, United at times pulled its competitive punches for fear of prices dropping. ("As with all plans of this nature where we are looking at taking share from competitors, we need to factor in competitive responses . . . . In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions.").

86.    ASR/Domino similarly anticipated competitive reactions, used pricing to send signals to competitors, and considered how its actions may cause market prices to decline.

87.     ASR/Domino decided not to get "aggressive" on pricing because ASR/Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing."  ASR/Domino also wanted to "signal to the market" that there would be tightness and ASR/Domino would "maintain price."

88.     ASR/Domino also observed that the proposed acquisition of Imperial by a member of the United cooperative was a "good thing" for ASR/Domino because it would help to align United's pricing strategy with ASR/Domino's.  ASR/Domino believed that after the acquisition of Imperial, "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry . . . ."

89.     Upon information and belief, Michigan Sugar likewise participated in the sharing of sensitive information regarding pricing and sold positions with the intention of artificially raising, fixing, maintaining, or stabilizing Granulated Sugar prices above the levels they would have been absent the anticompetitive conduct alleged herein.

### *Antitrust Injury*

90.     Granulated Sugar prices became significantly elevated during the Class Period as a result of Defendants' conduct.  This was contrary to pricing patterns prior to the Class Period.

91.     Moreover, sugar prices increased dramatically during the Class Period without a decline in the supply of sugar.

92.     In the past 20 years, the price of Granulated Sugar has doubled on an indexed basis. There is no non-conspiratorial economic rationale for the rate of price increases.

93.     United employed Commodity and Mr. Wistisen at least as early as the first half of 2019 to enable it to fix or coordinate prices with ASR/Domino.  Cane sugar prices are now at their

highest levels since November of 1974. Pricing reached a low point in February of 2014. Prices then started trending upward for the most part, but at modest levels of progression. Commencing on or about October of 2019, prices experienced one of the steepest climbs ever, which is ongoing.

94.     **Harm to Consumers.** Sugar is an inelastic good. It cannot be replaced. As such, consumers are forced to pay supracompetitive prices for Granulated Sugar and have been throughout the Class Period. As an intended consequence of Defendants' conduct, consumers have had to pay higher prices for Granulated Sugar in the Relevant Market. Additionally, consumers have been harmed due to a lack of competition between the Producing Defendants. This is because the Producing Defendants, having decided to manipulate and coordinate prices in lockstep have throttled any incentive to compete on price, quality, service, or other types of innovation.

95.     **Harm to Competition.** In a market free of Producer Defendants' conduct, other competitors in the Relevant Market would be more equipped to compete. However, due to fixing, stabilizing, or otherwise maintaining artificial prices, competitors are unable to penetrate the Relevant Market.

## V.     CLASS ALLEGATIONS

96.     This Action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals. The nationwide class Plaintiffs seek to represent is defined as follows:

> **Nationwide Class.** All persons, businesses, entities and corporations in the United States who indirectly purchased Granulated Sugar from one of the Producing Defendants in the United States beginning in January 1, 2019 and running through the time that the unlawful conduct alleged herein ceases.

97.     In the alternative to the nationwide class, Plaintiff Benmeleh seeks to represent the following state-wide class:

**Florida Sub-Class.** All persons, businesses, entities and corporations in the United States who indirectly purchased Granulated Sugar from one of the Producing Defendants in the State of Florida beginning in January 1, 2019 and running through the time that the unlawful conduct alleged herein ceases.

98. In the alternative to the nationwide class, Plaintiff Fowler seeks to represent the following state-wide class:

**New York Sub-Class.** All persons, businesses, entities and corporations in the United States who indirectly purchased Granulated Sugar from one of the Producing Defendants in the State of New York beginning in January 1, 2019 and running through the time that the unlawful conduct alleged herein ceases.

99. Excluded from the Classes are: Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; Plaintiffs' counsel; and all judges assigned to hear any aspect of this litigation.

100. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

101. **Numerosity.** Both the Nationwide Class and the Florida and New York state-wide sub-classes are so numerous that joinder would be impracticable.

102. **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a. Whether the Defendants violated the antitrust laws;

    b. Whether the Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Granulated Sugar in the United States and its territories;

    c. Whether the Defendants agreed to unreasonably restrain trade in violation of federal and state antitrust laws;

d.  The scope and duration of the alleged conspiracy;

e.  Whether the Defendants engaged in anticompetitive conduct;

f.  Whether Plaintiffs were harmed;

g.  Whether Plaintiffs are entitled to declaratory relief and injunctive relief to end Defendants' conduct; and

h.  Whether Plaintiffs and Class members are entitled to damages and other relief.

103.  **Typicality.**  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like every other Class member, were harmed by way of the anticompetitive conduct as alleged herein.  Plaintiffs, like all other Class members, were injured by Defendant's uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs.  The claims of Plaintiffs and those of the other Class members arise from the same operative facts and are based on the same legal theories.

104.  **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and protect the interests of the Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

105.  **Superiority of Class Action.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a

class action will preserve judicial resources by allowing the Class' common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

106. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

107. Adequate notice can be given to Class members directly using information maintained in the parties' records.

108. **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

109. This proposed class action does not present any unique management difficulties.

## FIRST CAUSE OF ACTION

### VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT

### AGAINST ALL DEFENDANTS

#### (On Behalf of the Nationwide Class)

110. Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

111. The Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, (15 U.S.C. §§ 1, 3) to raise, fix, maintain, or stabilize Granulated Sugar prices.

112. Since at least 2019, Defendants agreed with each other to exchange competitively sensitive non-public information regarding prices, output, and costs in order to raise, fix, maintain, or stabilize the prices of Granulated Sugar. The agreement was intended to and did unreasonably restrain trade, suppress competition, and have had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Granulated Sugar market in the United States in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

113. Pursuant to the agreement, the Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Granulated Sugar sold to Plaintiffs and Class members, who were indirect purchasers.

114. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

115. Plaintiffs and Class members were injured by Defendants' agreement that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of Granulated Sugar at artificially high levels. Plaintiffs and Class members paid higher prices for Granulated Sugar than they would have in the absence of Defendants' violations of Sections 1 and 3 of the Sherman Act.

116. Plaintiffs seek a declaratory judgment and injunctive relief consistent with this cause of action.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF THE STATE ANTITRUST LAWS

## AGAINST ALL DEFENDANTS

### (On Behalf of the Florida Sub-Class)

117.    Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

118.    **Florida.**  The anticompetitive use of Commodity and the exchange of competitively sensitive information by the Defendants set forth in this Complaint violated Florida's Deceptive and Unfair Trade Practices Act for the same reasons that they violate federal antitrust laws.

119.    The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade.  Fla. Stat. § 501.204(1).

120.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

121.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. *See* Fla. Stat. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

122.    Plaintiff Benmeleh and members of the Florida Sub-Class purchased the Producing Defendants' products indirectly within the state of Florida during the relevant statutory period. But for Defendants' conduct as set forth herein, the price would have been lower, in an amount to be determined at trial.

123. Defendants restrained competition of the conduct of business in the Relevant Market within the state of Florida. Further, in violation of FDUTPA, Defendants' unlawful conduct substantially affected Florida's trade and commerce. Specifically, Defendants' unlawful conduct occurred in part by fixing the prices that were charged in the Relevant Market in Florida.

124. Pursuant to the FDUTPA, Plaintiff seeks actual damages, declaratory relief, injunctive relief, reasonable costs and attorney's fees, as well as pre- and post-judgment interest.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE STATE ANTITRUST LAWS

### AGAINST ALL DEFENDANTS

**(On Behalf of the New York Sub-Class)**

125. Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

126. **New York.** The anticompetitive use of Commodity and the exchange of competitively sensitive information by the Defendants set forth in this Complaint violated New York's Donnelly Act (General Business Law § 340) for the same reasons that they violate federal antitrust laws.

127. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce within the state of New York.

128. Plaintiff Fowler and members of the New York Sub-Class purchased Producing Defendants' products indirectly within the state of New York during the relevant statutory period. But for Defendants' conduct as set forth herein, the price would have been lower, in an amount to be determined at trial.

129. Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

130. Defendants restrained competition of the conduct of business in the Relevant Market within the state of New York, in violation of New York General Business Law § 340. Defendants unlawful conduct substantially affected New York's trade and commerce and Defendants' unlawful conduct occurred in part by fixing the prices that were charged for in the Relevant Market in New York.

131. Pursuant to the Donnelly Act, Plaintiffs seek actual damages, treble damages, declaratory relief, injunctive relief, reasonable costs (in an amount not exceeding $10,000) and attorney's fees, as well as pre- and post-judgment interest.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes identified herein, respectfully ask this Court for a judgment that:

a.) Certifies the Nationwide Class and State Subclasses pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), directs that reasonable notice of this Action, as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class Nationwide Class and State Subclasses, and appoints Plaintiffs as representatives of the Class Nationwide Class and State Subclasses;

b.) Appoints Plaintiffs' counsel as class counsel for the Nationwide Class and State Subclasses;

c.) Enters judgment against Defendants, and in favor of Plaintiffs and the Classes, specifically, the Nationwide Class and State Subclasses, holding Defendants liable for the antitrust violations as alleged herein;

d.) Awards a declaratory judgment, declaring that the Producer Defendants' agreements were done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Market in violation of the antitrust laws;

e.) Grants permanent injunctive relief enjoining the Producer Defendants from making agreements with their horizontal competitors on pricing and other sensitive terms in the Relevant Market;

f.) Awards Plaintiffs and the Class (inclusive the Nationwide Class and State Subclasses) actual, treble, and exemplary damages as permitted plus interest in accordance with the law;

g.) Awards such equitable relief as is necessary to correct for the anticompetitive market effects as caused by Defendants' unlawful conduct, including disgorgement, restitution, and the creative of a constructive trust;

h.) Awards Plaintiffs and the Classes (inclusive of the Nationwide Class and State Subclasses) their costs of suit, including reasonable attorneys fees; and

i.) Directs such further relief as it may deem just and proper.

## VII.    JURY TRIAL DEMAND

132.    Plaintiffs and members of the Class, specifically, the Nationwide Class and State Subclasses, demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED:  March 15, 2024                          Respectfully submitted,

_/s/ Israel David_

Israel David
Blake Hunter Yagman
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Tel.:    212-739-0622
_israel.david@davidllc.com_
_blake.yagman@davidllc.com_